UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,    )<br>                              )<br>    Plaintiff,                  )<br>                              )<br>v.                            )<br>                              )<br>MARCUS McKINNEY and JAMES     )<br>YOUNG,                        )<br>                              )<br>    Defendants.               ) | Case No. 24-CR-20031 |

### ORDER

Defendant Marcus McKinney has been charged via Second Superseding Indictment (#27) with: distribution of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) (Count I); possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii) (Count II); possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii) (Count III); conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C) (Count IV); maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count V – 210 State Street); maintaining drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count VI – 111 Kentucky Avenue); conspiracy to engage in misleading conduct, in violation of 18 U.S.C. §§ 1512(k), (b)(3), and 2 (Count VII); and witness tampering, in violation of 18 U.S.C. § 1512(b)(1) (Count VIII).

Presently before the court is Defendant's Motion to Suppress Evidence (#71), filed on September 15, 2025, to which the government filed a Response (#73) on September 29, 2025. Defendant filed a Reply (#74) on October 1, 2025. The government filed additional documents—the affidavit of Daniel Weiss ("Weiss Affidavit") and a transcript—on October 14, 2025. For the reasons set forth below, Defendant's Motion (#71) is DENIED.

## BACKGROUND

Defendant's Motion seeks to suppress statements he made during his interview in police custody. That interview was videotaped and provided to the court as Exhibit A to the Motion. Exhibit B consists of select pages from a Springfield Police Department ("SPD") Field Case Report and a Field Case Report Supplement. The court has fully reviewed the video and report.

The government disputes factual assertions made in the Motion and originally sought an evidentiary hearing. However, at a hearing on October 10, 2025, the parties agreed that the government would file an affidavit for the court to consider in lieu of an evidentiary hearing. The government subsequently filed the Weiss Affidavit and a transcript of a portion of the interview.

"Evidentiary hearings are not required as a matter of course[.]" *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007). "District courts have discretion to forgo an evidentiary hearing on a motion to suppress if there are no disputed issues of material fact that will affect the outcome of the motion." *United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022). "And a video record of the events at issue can evaporate any factual

dispute that would otherwise exist, as courts view the 'facts in the light depicted by the videotape.'" *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 381 (2007)).

Between the video and factual clarifications made in Defendant's Reply, as well as the agreement of the parties, an evidentiary hearing is unnecessary. The court will view the facts in the light depicted by the videotape. See *id.* (affirming district court's decision based on factual finding it made by reviewing dashcam video); see also *United States v. Luna*, 2011 WL 663062, at *2 n.7 (N.D. Ill. Feb. 14, 2011) (making factual finding regarding consent to search, although undisputed, based on court's observations of conversation between the defendant and law enforcement on video recording).

The rest of the documents—namely, the pages of the Report and Supplement, Weiss Affidavit, and transcript—have little probative value. First, Defendant argues that portions of the Report and Supplement contradict, or at least are inconsistent with, the statements he made during the interview, which is part of a broader argument that his statements were incoherent and nonconclusive. As will be discussed below, that argument is irrelevant.

Next, the Weiss Affidavit largely consists of his version of portions of the interview and concludes with his beliefs about Defendant's mental and physical state. But because Weiss did not testify before the court, his assertions were not subjected to cross examination and the court did not have the opportunity to assess his credibility during live, in-person testimony. That significantly weakens the probative value of the affidavit. See, e.g., *United States v. Funds in the Amount of $830,000 in United States Currency*, 2019 WL 95169, at *4 (N.D. Ill. Jan. 3, 2019); *United States v. Marzook*, 435 F.

3

Supp. 2d 708, 752 (N.D. Ill. 2006). Moreover, most of the affidavit is just a narrative of the events depicted in the video. The court has reviewed the video extensively and will draw its own conclusions based on what is depicted. The court affords very little weight to the affidavit.

Finally, the transcript is largely unnecessary, because the short portion of the interview it transcribes is, for the most part, audible from the video.[1] The court will rely on its own observations of the video.

Pleadings

Defendant asserts that his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were violated because he did not waive those rights before giving his custodial interview, and his physical condition during the interview prevented him from knowingly making a voluntary and intelligent waiver. He also asserts that his statements were incoherent and nonconclusive—not definitive statements or admissions. Thus, Defendant argues that his statements, the video recording of the interview, detectives' impressions of Defendant's statements, and reports made based on the statements should be suppressed. He also argues that any evidence obtained as a result of the interrogation should be suppressed as fruit of the poisonous tree.

In response, the government argues that Defendant waived his *Miranda* rights by answering questions without unambiguously asserting his right to remain silent, and that his waiver was voluntary under the totality of the circumstances. It also argues the

---

[1] The court used headphones to enhance its ability to the hear the recording.

4

ambiguity or inaudibility of Defendant's statements is irrelevant to determining whether he waived his *Miranda* rights. Finally, it argues the fruit of the poisonous tree doctrine does not apply to *Miranda* violations.

Defendant's Arrest

SPD officers arrested Defendant on June 26, 2024, at 2:27 p.m.[2] He was handcuffed, taken to the SPD, and put in an interview room. Two SPD detectives, Weiss and Charles Redpath, conducted a custodial interview of Defendant.

Video of the Interview

The audio and video of the interview was recorded by a camera in the interrogation room. The video displays text on the bottom of the frame: "Interview Room 2 - MainCam 2024-06-26 14:52:16."[3] Relevant portions are described below.

The beginning frame depicts a table, three chairs, Defendant handcuffed and lying on the floor with his coat covering him like a blanket, and a pair of glasses and water bottle on the table. At 6:34[4], Weiss enters the room and speaks with Defendant, asking if he was "good," to which Defendant responds that he is alright. Weiss asked if

---

[2] The time of Defendant's arrest is taken from his Motion.

[3] The timestamps on the video indicate that Defendant was in the interview room at 2:52 p.m., and his handcuffs removed at 3:16 p.m., meaning that Defendant was in handcuffs for approximately 45 minutes from 2:27 to 3:16 p.m.

[4] The court will use time stamps in relation to the run time of the exhibit (from 00:00 to 2:02:22) and not the time stamp on the video (beginning at 14:52:16).

Defendant wanted to sit or if he was good lying down, and Defendant says he is good lying down.

Weiss then identifies himself and says that once his partner gets there in about ten minutes, they want to have a conversation with Defendant. He asks if Defendant needs anything or has any questions, to which Defendant responds, "Nah, not really." At 7:16[5], Weiss asks, "…catch a little cat nap?" Defendant responds, "Yeah . . . I got high blood pressure." At 7:21, Weiss asks again if Defendant is good, and Defendant says "Yeah." Defendant remains on the floor during this interaction.

At 23:28, Weiss enters the room with Redpath. Defendant says he'd stay on the floor, but Weiss says Defendant has to sit in the chair. Defendant agrees, sits up on his own, and uses the chair to stand up. At 24:10, Weiss takes the handcuffs off Defendant, and the three then sit down.

At 24:41, Weiss introduces himself (again) and Redpath, using their first names, and tells Defendant they want to have a conversation with him. Weiss asks Defendant to spell his full name and state his date of birth. Defendant sits with his head in his hands, but responds to the questions immediately.

At 25:30, Weiss begins reading Defendant the juvenile version[6] of his *Miranda* rights, including his right to remain silent, right to counsel, and right to stop the

---

[5] The court was able to hear the audio clearly with the use of headphones. However, some words and statements were still unintelligible. Those portions are indicated with ellipses.

[6] The juvenile *Miranda* card contained the required *Miranda* warnings but phrased the warnings in language considered more suitable for juveniles.

6

interview at any time. At that point, Weiss realizes he is reading the juvenile version. The detectives explain that to Defendant, and at 26:12, Redpath reads the adult version of the *Miranda* rights to Defendant. After each right was read, Redpath asked Defendant if he understood the right, and Defendant verbally answered affirmatively by saying "yeah," to each one.

At 26:58, Weiss begins by stating they could not make any promises to Defendant, but could make the extent of his cooperation known. At 27:27, Weiss says: "Do you want me to start askin' questions or you just wanna start talkin'?" Defendant responds: "Imma let you talk." Weiss begins explaining they have been building a case against Defendant for approximately six to eight months. Weiss then asks Defendant questions; Defendant answers, sometimes hesitating and mumbling, but sometimes clearly, all while seated with his head in his hands.

At 29:33, Weiss asks: "What have you been selling? Coke, fentanyl, … —" Defendant sits up and interjects, "Ah, nah, ain't none of that. Just a little coke." When asked how much, he says, "Whatever I get my hands on." At 30:14, Defendant shifts back in his chair and puts his hands behind his head.

Questioning continues for another 15 to 20 minutes. Defendant keeps responding through the interview, although some answers are hesitant or vague. For the most part, Defendant faces Weiss while Weiss is speaking. He shifts his body position naturally, at one point putting on his glasses and standing up to put his coat on. The detectives continue trying to get Defendant to cooperate and share information, but at 44:26 Defendant tells them that he would rather lay in his cell for a while and think about

whether he wanted to cooperate, and the interview ends. The detectives leave the room at 55:50.

At 1:33:34, Defendant stretches, stands up with the assistance of a hand on the table; the door opens and someone asks Defendant if he is "good," and Defendant asks if he can use the bathroom. At 1:35:54, Defendant reenters the room, reaches for and puts on his coat, sits back down in a chair, and yawns, with an officer across from him and the door ajar. Both the officer and Defendant appear relaxed and they briefly converse about what will happen next, as well as casual topics. Defendant keeps yawning. The officer leaves and Defendant stays seated. At 2:00:00, Weiss opens the door, and Defendant stands up, stretches, and walks over to him.

The video and Report and Supplement also establish that Defendant was in a Residential Re-entry Program through the Federal Bureau of Prisons at the time of his arrest.

<u>Weiss Affidavit</u>

The portions of the Weiss Affidavit that are his retelling of the events on the video are omitted. The following additional assertions are contained in the affidavit:

Weiss is a detective with the SPD and a Task Force Officer with the Drug Enforcement Administration. In his career he has assisted in and led multiple narcotics investigations and has made numerous felony and misdemeanor arrests. While employed with the SPD, he has investigated a wide range of criminal acts including property and financial crimes, drug and weapon offenses, robbery, armed robbery, homicide, battery, child abuse, sex offenses, and other related serious criminal offenses.

He has attended training courses for lead homicide investigator, interview and interrogation, narcotics investigation, report writing, surveillance, cell phone technology, and electronic evidence collection.

On June 26, 2024, Weiss observed Defendant walking from the Family Guidance Center in Springfield, Illinois, to his vehicle located near the corner of 12th and Washington Street. Before Defendant approached his vehicle, he was arrested by SPD officers, taken to the Sangamon County Jail for an interview, and placed in an interview room.[7]

Weiss states: "I believe that [Defendant] understood my questions as his responses to my questions demonstrated that he understood them." He concludes his affidavit: "While I believe [Defendant] minimized some of his responses to my questions, his answers reflected he understood what I was asking and he did not appear to be confused, disoriented, or under the influence of any alcohol or drug during the duration of our interview."

## ANALYSIS

"The Fifth Amendment provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Smith v. Boughton*, 43 F.4th 702, 708 (7th Cir. 2022) (quoting U.S. Const. amend. V). The U.S. Supreme Court's decision in

---

[7] The Motion, Response, and Report and Supplement all indicate that Defendant was interviewed at the SPD. The Supplement indicates that Defendant was transported to the Sangamon County Jail after his interview.

*Miranda v. Arizona* articulated a set of constitutional guidelines to assure that an individual in custody is accorded that privilege. 384 U.S. 436, 439 (1966).

An individual in custody must be informed of their *Miranda* rights before law enforcement officers can interrogate the individual. *United States v. Thurman*, 889 F.3d 356, 364 (7th Cir. 2018). An individual in custody can waive those rights and speak with police, if the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 444. However, an individual may also revoke that waiver, at any time and in any manner, and cut off questioning if they wish, and that request must be scrupulously honored by law enforcement. See *id.* at 444, 473-74; *Michigan v. Mosley*, 423 U.S. 96, 103 (1975). The burden is on the individual in custody to make a "clear and unambiguous assertion" of their rights, at which point officers must cease their questioning. *Thurman*, 889 F.3d at 364 (quoting *United States v. Shabaz*, 579 F.3d 815, 818 (7th Cir. 2009)).

"Even if a suspect does not invoke his *Miranda* rights, his self-incriminating statements cannot be used against him in court unless the Government shows by a preponderance of the evidence that he voluntarily waived these rights." *Id.* (citing *Berghuis v. Thompkins*, 560 U.S. 370, 382-84 (2010)). "[T]he prosecution must prove *both* a valid *Miranda* waiver *and* the voluntariness of the resulting confession by a preponderance of the evidence." *United States v. Outland*, 993 F.3d 1017 (7th Cir. 2021) ("*Outland I*").

Waiver of *Miranda* Rights

Defendant first argues that although he was given his *Miranda* rights, the video of the interview "makes it very clear that [Defendant] never waived his *Miranda* Rights at all." That argument appears to based on the fact that Defendant did not waive his *Miranda* rights "in writing or verbally." The government responds that Defendant acknowledged that he received his *Miranda* warnings and an express waiver of *Miranda* rights is not required before questioning.

To the extent Defendant argues that an express waiver of his *Miranda* rights was required, that is easily dispatched—an express waiver is not required. See *Thurman*, 889 F.3d at 364 ("Waiver can be express or implied." (citing *Berghuis*, 560 U.S. at 384)).

In the case of implied waiver, "waiver may be inferred from a defendant's understanding of his rights coupled with a course of conduct reflecting his desire to give up these rights." *Id.* (cleaned up). "As the Supreme Court has explained, 'the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.'" *Id.* (quoting *Berghuis*, 560 U.S. at 385).

Defendant impliedly waived his *Miranda* rights. The video shows that Defendant was read his *Miranda* rights—twice—and had verbally responded "yeah" to communicate his understanding after each right was read to him by Redpath. Weiss told Defendant that he (Weiss) and Redpath could not make any promises to Defendant, but would communicate his cooperation, and then asked Defendant: "Do you want me to start asking questions or you just wanna start talkin'?" Defendant

11

responded that Weiss could talk. Weiss obliged, speaking first, and then asking Defendant questions, to which Defendant began responding. There is no argument or suggestion that the detectives coerced Defendant into speaking. The court finds that Defendant "understood his rights and deliberately chose to relinquish them by engaging in the interrogation." See *Thurman*, 889 F.3d at 365.[8]

<u>Knowing, Voluntary, and Intelligent Waiver</u>

Defendant goes on to argue that the government "is unable to meet their burden of establishing by a preponderance of the evidence that [Defendant] knowingly and voluntarily waived his *Miranda* Rights."

The government bears the burden to prove by a preponderance of the evidence that Defendant's implied waiver of his rights was made knowingly, voluntarily, and intelligently, taking into account the totality of the circumstances. See *Shabaz*, 579 F.3d at 817, 820 (citing *Miranda*, 384 U.S. at 475, and *United States v. Jackson*, 300 F.3d 740, 748 (7th Cir. 2002)). The waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception" and be made knowingly and intelligently,

---

[8] Relatedly, Defendant's Motion states that he had tried to end the interrogation at least twice, but that Weiss and Redpath continued questioning him nonetheless, which hints at an argument that some statements should be suppressed because his requests were not scrupulously honored. But Defendant does not actually make that argument. And as the government notes, Defendant does not allege that he unambiguously invoked his right to remain silent after receiving his *Miranda* warnings and prior to making the statements he seeks to suppress. Accordingly, the court will not address this point. See *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("[P]erfunctory and undeveloped arguments . . . are waived." (quoting *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021))).

12

"with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Outland I*, 993 F.3d at 1021.

"[F]or a waiver to be valid, the 'totality of the circumstances surrounding the interrogation' must reveal 'the requisite level of comprehension' by the defendant." *United States v Outland*, 73 F.4th 482, 486 (7th Cir. 2023) ("*Outland II*") (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In reviewing the totality of the circumstances, courts consider "the defendant's background and conduct, the duration and conditions of the interview and detention, the physical and mental condition of the defendant, the attitude of the law enforcement officials, and whether law enforcement officers used coercive techniques, either psychological or physical." *Id.* (quoting *Shabaz*, 579 F.3d at 820).

Considering the totality of the circumstances, the court finds that Defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights. Defendant is familiar with the criminal justice system and has been involved in multiple criminal misdemeanor and felony cases.[9] And at the time of his arrest, he was technically in the custody of the Federal Bureau of Prisons through the Residential Re-entry Program.

---

[9] In its Response, the government represents that Defendant has been arrested six times: in 1994, 1995, 1997, 2001, 2018, and 2024 (the arrest in this case). The court takes judicial notice of publicly available records in Vermilion County of four criminal cases against Defendant: 2017-CF-692, 2017-CF-795, 2018-CM-227, and 2018-CM-289. See *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). In any event, Defendant is familiar with the criminal justice system.

Defendant was arrested in the afternoon and was handcuffed for approximately 45 minutes until they were removed. The interview itself was only about 30 minutes long, and it was just shy of 1.5 hours from the time of his arrest at about 2:30 p.m. until the conclusion of the interview at around 3:45 p.m. During the interview, Defendant was not handcuffed, he had access to his glasses and water, and he was drinking water, changing positions, naturally shifting in his chair, and stretching. He put his glasses on and at one point, stood up and put on his jacket.

Weiss and Redpath remained calm, relaxed, polite, and casual for the duration of the interrogation. They were dressed in plain clothes and spoke colloquially. Defendant was also calm and respectful throughout. While the detectives certainly tried to elicit information from Defendant, who sometimes paused or hesitated before giving incriminating answers or information, there was no psychological or physical coercion. Additionally, Defendant eventually told the detectives that he wanted to lay in his cell and think about whether he wanted to cooperate. That demonstrates Defendant's knowledge and understanding of his *Miranda* warnings that he was not required to speak to the detectives and had the right to terminate the interview.

Defendant's main argument is that his "physical condition prevented him from knowingly making a voluntary and intelligent waiver." He posits that the video establishes that he "appeared to be under the influence of something," and that he was

nonresponsive and incoherent during the interrogation, and even sleeping at times. He argues that "[h]is body movements indicated that he was not fully cognizant of what was going on and he appeared 'out of it,'" he was not looking at Weiss and Redpath, and his body and mind "appeared to be wandering."[10]

The government responds, first arguing that there is no evidence to support the claim that Defendant was under the influence. It contends that Defendant's responses only show Defendant's "natural hesitancy to make incriminating statements" and that he was "cautious or reluctant" to answer questions, not that he was under the influence. It also notes that neither intoxication nor an impaired mental state render a *Miranda* waiver invalid by themselves—the degree of intoxication and its effects, if any, on the ability to make a knowing and intelligent waiver is a question of fact.

No evidence, beyond the video, has been presented to show Defendant's intoxication, such as a toxicology report or affidavit. Having reviewed the video, the court cannot agree with Defendant's characterization of his behavior as depicted on the video, or that the video establishes that his physical condition precluded him from

---

[10] Defendant also cites *Moran*, 475 U.S. at 421, and *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998), in support of his argument that his physical condition prevented him from making a voluntary and intelligent waiver. But as the government notes, in *Moran*, voluntariness of the waiver was not at issue because there was no suggestion that police used physical or psychological pressure to elicit the statements in question. See *Moran*, 475 U.S. at 421-22. In a similar vein, in *Dillon*, the defendant alleged law enforcement agents used threats of physical violence to scare him into confessing involuntarily, but the district court discredited that version of the events, and the Seventh Circuit found no error in that decision. *Dillon*, 150 F.3d at 75-58. Defendant does not argue here that his waiver was involuntary because of any coercive techniques.

knowingly making a voluntary and intelligent waiver. Defendant was certainly tired—when he was alone in the room he was mostly lying down, possibly sleeping, fairly motionless, and yawing throughout the interview. To that point, Weiss initially checked on Defendant and asked if he was "good," to which Defendant responded that he had high blood pressure but still confirmed that he was okay. Defendant was asked a few times throughout the video if he was okay, to which he always responded that he was. Defendant did not indicate that he was sick or needed any kind of medical treatment. He did not exhibit signs of confusion or medical distress. While Defendant references a portion of the video where he said that he uses cocaine, he does not state in the video, and he has not argued here, that he told the detectives that he used any substance before his arrest, or that he did in fact use any substance before his arrest.

The court's observation of Defendant on the video is that he was aware, oriented, and responded quickly to most of the detectives' questions. The times Defendant did not respond quickly reflects, as the government put it, a natural hesitancy to make incriminating statements. He shifted positions in a natural and controlled manner, promptly standing up and sitting down, occasionally with assistance of a chair or the table. He followed directions when asked. His body movements (besides yawning) all appeared intentional—he sat upright or sometimes with his head in his hands, usually faced Weiss while he was speaking, stood up multiple times and took his shoes off with ease, stretched, and repositioned while lying on the floor. When Defendant did decide to lie on the ground, he always moved to the floor in a controlled manner—he did not pass out, fall, stumble, or collapse. This is all consistent with a person who is tired, not

16

intoxicated—at least, not so intoxicated they cannot make a knowing and intelligent waiver. See *Outland II*, 73 F.4th at 487 ("[N]either intoxication nor an impaired mental state necessarily renders a *Miranda* waiver invalid. Rather, the degree of intoxication and its effects, if any, on a defendant's ability to make a knowing and intelligent waiver are questions of fact." (citation omitted)).

Defendant makes the final argument that his responses were incoherent, nonconclusive, ambiguous, and speculative. Some of Defendant's responses were unintelligible on the video recording, but that appears to be attributable in part to technical issues with the recording. At times, Defendant gave answers that were not clearly articulated; but, Weiss and Redpath appeared to understand him and generally did not need clarification or ask Defendant to repeat himself. Whether his potentially incriminating statements were equivocal has no bearing on whether his *Miranda* waiver was knowing, intelligent, and voluntary.

Considering all the factors, the court finds that Defendant possessed the requisite mental capacity to, and did in fact, make a voluntary, knowing, and intelligent waiver of his *Miranda* rights.

<u>Voluntariness of Statements</u>

In a single sentence, Defendant raises an argument that his statements were not voluntary. Whether the statements themselves were voluntary is a separate question from whether he knowingly, intelligently, and voluntarily waived his *Miranda* rights. See *Outland I*, 993 F.3d at 1021 ("A defendant's challenge to the admission of statements made during a custodial interrogation presents two separate questions: whether he

17

received and validly waived his *Miranda* rights, and whether his statements themselves were voluntary."). "A confession will be deemed involuntary if police obtained the statement through coercive means that overcame the defendant's free will." *Id.*

The court finds that Defendant's statements were voluntary for all the reasons above. Additionally, Defendant makes no argument there was any coercion that overcame his free will, nor does the video support such a finding.

In sum, the court finds that Defendant knowingly, voluntarily, and intelligently waived his *Miranda* rights and his statements were voluntary.[11] Defendant's Motion to Suppress is DENIED.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Suppress (#71) is DENIED.

(2) This matter remains set for a pretrial conference on October 27, 2025, at 1:30 pm and a jury trial commencing on November 12, 2025.

ENTERED this 22nd day of October 2025.

                                          s/ *Colin S. Bruce*
                                          COLIN S. BRUCE
                                          U.S. DISTRICT JUDGE

---

[11] Therefore, the court need not address whether any evidence should be suppressed as fruit of the poisonous tree.